IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANKLIN TAYLOR,

    Petitioner,       No. CIV S-06-0702 RRB KJM P

    vs.

GEORGE STRATTON, Warden,

    Respondent.       FINDINGS AND RECOMMENDATIONS

_____/

    Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus challenging his Solano County conviction for second degree murder stemming from the death of Nathaniel Joshua, the son of his girlfriend, Tiffani Roberts. On May 17, 2006, respondent filed a motion to dismiss on the ground that the petition is untimely. On January 31, 2007, the court directed petitioner to file further evidentiary support for his claim that retained counsel had, in essence, abandoned petitioner. On February 6, 2007, petitioner filed additional points and authorities and on February 22, 2007, he filed exhibits. Respondent has not filed further briefing or rebutting exhibits.

I. Background

    Petitioner was convicted of second degree murder sometime in 1991. Counsel on appeal filed a "no issues" brief under the authority of People v. Wende, 25 Cal.3d 436 (1979).

1  The Court of Appeal for the First Appellate District affirmed petitioner's conviction in an
2  opinion filed May 21, 1992.  Motion To Dismiss (MTD), Ex. 1; Pet., Ex. A.
3        In November 1996, petitioner filed a habeas petition in the Court of Appeal; it
4  was denied two days after it was filed.  MTD, Ex. 2.
5        On September 9, 2002, Marc Zilversmit, who was then counsel for petitioner,
6  filed a petition for a writ of habeas corpus in Solano County Superior Court.  MTD, Ex. 3; Pet.,
7  Ex. M.  Among the declarations that appear to have been offered in support of this petition is one
8  from Zilversmit, in which he averred that petitioner's family approached him in the summer of
9  2001; that petitioner did not have a copy of the trial transcripts; that he finally obtained a copy of
10 the transcripts in September 2001 by having a copy made from the transcript archived in the
11 Court of Appeal; that he did not receive trial counsel's file until October 2001; that between
12 December 2001 and June 2002, he had his investigator locate and interview witnesses to
13 Roberts' acts of violence against her son; that trial counsel signed a declaration in late July 2002.
14 Pet., Ex. L.
15       Another exhibit was petitioner's declaration, in which he stated that his transcripts
16 were lost sometime in 1992 by the San Francisco Sheriff's Department, during a transfer in
17 custody.  He was not able to obtain another copy from the Superior Court; the lack of his
18 transcript, among other things, hindered his ability to pursue collateral relief.  Pet., Ex. E ¶¶ 9-13.
19       The Superior Court denied the petition on February 21, 2003.  MTD, Ex. 3; Pet.,
20 Ex. M.  Thereafter, petitioner pursued his state court remedies by filing petitions in the Court of
21 Appeal and the California Supreme Court; the latter denied his petition on August 18, 2004.
22 MTD, Exs. 4-5.  Petitioner filed his petition in the Northern District on September 9, 2004, and it
23 was transferred to this district on March 31, 2006.
24 /////
25 /////
26 /////

II. <u>Analysis</u>

    A. <u>The Statute Of Limitations</u>

One of the changes the AEDPA made to the habeas statutes was to add a statute of limitations for filing a habeas petition:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244.

Because petitioner's conviction was final before the enactment of the AEDPA on April 23, 1996, his federal petition was due no later than April 24, 1997 absent any statutory tolling. <u>Laws v. Lamarque</u>, 351 F.3d 919, 921 (9th Cir. 2003). In this case, petitioner is entitled to statutory tolling for the three days his 1996 petition was pending in the Court of Appeal, extending the deadline for his federal habeas petition to April 27, 1997. <u>Nino v. Galaza</u>, 183 F.3d 1003, 1006-07 (9th Cir. 1999). Petitioner's subsequent round of state petitions does not revive the lapsed statute of limitations. <u>Jiminez v. Rice</u>, 276 F.3d 478, 482 (9th Cir. 2001).

1    Petitioner contends that he is entitled to tolling during the "gap" between the 1996 Court of Appeal petition and the 2004 Supreme Court petition, because the latter petition was a step "up the ladder" of state collateral review.

In some instances, the "gap" between the denial of a petition on one level and the filing of a petition on the next level is deemed to be part of the time in which the petition was pending, so long as there was not undue delay between the denial of one petition and the filing of another. Biggs v. Duncan, 339 F.3d 1045, 1048 (9th Cir. 2003). In Evans v. Chavis, 546 U.S. 189, 126 S.Ct. 846, 852 (2006), the Supreme Court directed the federal courts to determine whether a "gap" petition was delayed unreasonably, even when a state court did not deny the petition as untimely. The Court suggested that a gap longer than the thirty to sixty days permitted in states with written rules for filing might be reasonable, while six months would not be. Id. at 854. However, in Carey v. Saffold, 536 U.S. 214, 226 (2002), the Supreme Court recognized that if the California Supreme Court clearly rules that any gap is unreasonable, "that would be the end of the matter."

In this case, the California Supreme Court denied petitioner's state petition with a citation to In re Robbins, 18 Cal.4th 770, 780 (1998); the pinpoint cite is to the page that discusses "substantial delay" and places the burden on petitioner to establish the absence of such delay. MTD, Ex. 5; Pet., Ex. O. Because the court explicitly found the petition untimely, this court need not determine whether the 2003 Supreme Court petition was part of the progression up the ladder beginning with the 1996 Court of Appeal petition, despite the intervening Superior Court petition, and whether the gap between the filings was reasonable.

Accordingly, petitioner is not entitled to statutory tolling between the filing of his 1996 Court of Appeal petition and the disposition of the 2003 Supreme Court petition.

/////
/////
/////

4

B. Equitable Tolling

Petitioner contends that he is entitled to equitable tolling because he had hired attorney Gary Diamond, who essentially abandoned him, and also because he had limited access to the law library and his transcripts were lost. Reply to MTD filed Aug. 25, 2006 (Opp'n) at 2.[1]

The Ninth Circuit has held:

> We will permit equitable tolling of AEDPA's limitations period only if extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time. When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate.

Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999) (internal quotations & citations omitted). It is petitioner's burden to show he is entitled to equitable tolling. Espinoza-Matthews v. California, 432 F.3d 1021, 1026 (9th Cir. 2005). To meet his burden, he must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

1. Attorney Misconduct

The Ninth Circuit has recognized that an attorney's "egregious misconduct" may be grounds for equitable tolling. In Spitsyn v. Moore, 345 F.3d 796 (9th Cir. 2003), the Ninth Circuit found equitable tolling when retained counsel failed to file the federal habeas in a timely fashion, refused contact with petitioner and his mother, and failed to release Spitsyn's files and records until two months after the AEDPA statute of limitations had run.

Petitioner has submitted records suggesting that attorney Diamond in fact abandoned him. See Reply To Court Order filed Feb. 22, 2007 (Reply), Exs. A-C. This does not, however, entitle petitioner to equitable tolling. Although petitioner has not submitted a retainer agreement, he has provided a copy of an invoice Diamond prepared for petitioner and his

---

[1] All page references to the opposition are to the page numbers assigned by CM/ECF.

family. It suggests that petitioner's first contact with Diamond was on December 22, 1997, after the statute of limitations had run. Id., Ex. C.[2] Diamond's inaction, however reprehensible, did not cause petitioner's failure to timely file his federal habeas petition before April 27, 1997.

### 2. Loss Of Transcripts

In United States v. Battles, 362 F.3d 1195 (9th Cir. 2004), the Ninth Circuit considered the relationship between access to transcripts and timely filing under the AEDPA. Battles alleged he had not timely filed his motion to vacate his sentence under 28 U.S.C. § 2255 because his appellate attorney did not send him his transcripts. The Ninth Circuit noted that when an attorney refuses to provide a petitioner's file, the petitioner may be entitled to equitable tolling; it found the reasoning equally applicable when the transcripts have been withheld. Id. at 1197-98. The court observed:

> The fact that Battles did ultimately file his petition without the transcript does not necessarily tell us whether the alleged attorney behavior and Battles' fight to get the transcripts actually delayed him to the point that he could not file in a timely fashion.

Id. at 1198 n.5.

More recently, in Espinoza-Matthews, the Ninth Circuit considered whether a petitioner was entitled to equitable tolling for the entire time he was in administrative segregation and deprived of his legal property. See 432 F.3d at 1024. In that case, the petitioner asked for access to his legal property, which was being stored while he was in segregation, but was told he could not have access until he was released. The court found petitioner entitled to tolling for the entire period he was deprived of his legal materials, even though he still had a month after the papers were returned to him before the statute of limitations expired. Id. at 1028.

/////

---

[2] Even if petitioner did not actually meet with Mr. Diamond on December 22, 1997, see Reply, Ex. B, petitioner has not pointed to any earlier date on which he had contact with the attorney.

1　　　　　　In this case, petitioner maintains that he filed grievances and a lawsuit and wrote
2 to the Superior Court in an attempt to secure his original, or a replacement copy of, his
3 transcripts.  Pet., Ex. E ¶¶ 9, 11; Opp'n at 2.  He has not, however, provided any evidentiary
4 support for these claims.
5　　　　　　Petitioner avers that the loss of the transcripts was a "major roadblock" to filing
6 any collateral attack on his conviction.  Pet., Ex. E ¶ 10.  However, apart from this conclusory
7 statement, he has not suggested how the lack of transcripts made it impossible for him to file a
8 petition on time.  In light of <u>Battles</u>, it is not determinative that petitioner was able to file a writ
9 in the Court of Appeal in November 1996.  Rather, this is a factor that suggests the loss of his
10 transcripts did not prevent his timely filing.  It also is significant that the main claim in his writ is
11 ineffective assistance of counsel stemming from counsel's failure to investigate and call
12 witnesses who would have described Roberts' acts of violence against her son, a claim petitioner
13 could have pursued without the transcript.  Petitioner has not demonstrated the causal link
14 between the loss of the transcripts and his inability to file his petition within the limitations
15 period.
16　　　　　3.　<u>Access To The Law Library</u>
17　　　　　　Petitioner makes a conclusory argument that he was on lockdown during much of
18 the limitations period and was not given access to the law library.  Opp'n at 2.  Several courts
19 have rejected the impact of restrictions on law library access as bases for equitable tolling unless
20 the petitioner can show actual harm.  <u>Wilson v. Bennett</u>, 188 F. Supp. 2d 347, 353-54 (S.D.N.Y.
21 2002) (limited access to library); <u>Lindo v. Lefever</u>, 193 F. Supp. 2d 659, 663-64 (E.D.N.Y. 2002)
22 (same).  Petitioner has made no attempt to link the restrictions with an inability to file his habeas
23 petition.
24　　C.　<u>Actual Innocence</u>
25　　　　　　Petitioner also contends that he is entitled to an exception to AEDPA's statute of
26 limitations in light of his actual innocence.  Reply at 5; Supp. Opp'n filed on Feb. 6, 2007.

In <u>Schlup v. Delo</u>, 513 U.S. 298, 312, 314-15 (1995), the Supreme Court held that a habeas petitioner who makes "a colorable showing of actual innocence" that would implicate a "fundamental miscarriage of justice" may be entitled to have "otherwise barred constitutional claim[s]" considered on the merits. The Ninth Circuit has suggested that a sufficient <u>Schlup</u> showing might overcome the statute of limitations bar. <u>Majoy v. Roe</u>, 296 F.3d 770, 775-76 (9th Cir. 2002).

This exception to the statute of limitations is concerned with actual, as opposed to legal, innocence and must be based on reliable evidence not presented at trial. <u>Schlup</u>, 513 U.S. at 324; <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998). It is petitioner's burden to demonstrate actual innocence. <u>Jaramillo v. Stewart</u>, 340 F.3d 877, 883 (9th Cir. 2003). To meet his burden, petitioner must show that

> a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.

<u>Schlup</u>, 513 U.S. at 327 (internal citation, quotation omitted). The Court in <u>Schlup</u> elaborated on the standard:

> The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

<u>Id</u>. at 329.

Neither party has submitted the transcripts of the trial, but neither party has disputed the facts as outlined by the Court of Appeal when it considered the <u>Wende</u> brief or the Solano County Superior Court when it considered the habeas petition.

The Court of Appeal described the evidence at trial as follows:

Tiffani Roberts and her two-year-old son Nathanial Joshua (Nathan) were living in a Fairfield apartment with appellant in October 1990. On the morning of October 26, appellant drove Roberts to an appointment. After dropping her off, he left with Nathan in the back seat.

At 10:40 a.m., appellant brought Nathan to the emergency room at North Bay Medical Center. Appellant told a nurse he had stepped out for a short time and found the child in the bathtub when he returned. Later, appellant also told Roberts that he had found Nathan face down in the tub, his mouth bleeding.

When appellant arrived at the hospital with Nathan, the child was not breathing and had no pulse, and attempts to revive him were unsuccessful. The emergency room physician observed numerous bruises on his body but no signs of drowning; he suspected child abuse. An autopsy revealed several bruises on Nathan's left chest wall and abdomen which were consistent with knuckle or fist marks; he also had parallel linear bruises on his arms and a large bruise on his back. His small bowel had been torn in half and its mesentery vessels ruptured; as a result of these injuries, he bled to death.

Appellant had hit Nathan on at least three other occasions. Once, he was unsuccessfully trying to get Nathan to sit on the potty chair. Nathan kept crying; appellant grabbed him by the arm and hit him very hard several times on his bare bottom until Lolita Roberts, Tiffani's sister, intervened. Appellant also tried to get Nathan to use the bathroom at his brother's house; when the child kept crying, appellant hit him hard on the legs and thighs several times. Another time, when Roberts, appellant, and Nathan were alone at their apartment, appellant picked him up by the arm and hit him hard with a shoe seven or eight times.

Appellant turned himself in to the Fairfield Police Department on October 27, accompanied by members of his family. He was upset and crying. According to two detectives who were present, he stated, "It was an accident."

Roberts did not hit or strike her son on either the 25th or 26th of October. She acknowledged that she had been granted immunity for any crime relating to his death in exchange for truthful testimony.

/////

/////

/////

> The defense theory was that appellant was not the perpetrator and that Roberts herself may have caused Nathan's injuries. Defense counsel also argued that no matter who hit Nathan, the crime looked most like involuntary manslaughter.

Pet., Ex. A at 1-3. The Solano County Superior Court added this information: that there was "expert testimony of only a 15-20 minute bleed-out time between the lethal blows and the child's death." Id., Ex. M at 2:3-4.

Petitioner's claim of actual innocence is based on the declarations from family and friends, attesting to Roberts' prior acts of violence against her son. Petitioner's mother, Patsy Taylor, averred that she had seen Tiffani hit Nathan on several occasions and that, in general, Roberts was impatient with Nathan. Id., Ex. F. Petitioner's sister, Debra Casey, asserted that Roberts did not want to be bothered with a baby and hit him "all the time." Id., Ex. G. Yusef Johns, a friend of petitioner's, claimed that he saw Roberts discipline Nathan by hitting him hard enough to make him cry, but that petitioner treated Nathan like his own son. Id., Ex. H. Eraina Johns, the older sister of Yusef, said she saw Roberts punch Nathan in the chest. Id., Ex. I. Richard Beard, another of petitioner's friends, saw Roberts grab Nathan by the arm and drag him roughly on the ground. Id., Ex. J. Finally, Ronald Raynor, another of petitioner's friends, observed Roberts hit Nathan with a belt and heard Roberts' mother berate her for the way Roberts treated her son. Id., Ex. K.

While these declarations clearly establish Roberts' mistreatment of her son, the crucial time period for the fatal abuse was, according to the expert testimony relied upon by the Solano County Superior Court, a relatively short period before the child's death, a time when Roberts was at the welfare office and petitioner was alone with the child. Accordingly, the evidence of Roberts' prior abuse of her son may have raised a reasonable doubt, but falls short of showing petitioner's actual innocence. This is bolstered by petitioner's apparent concession that he struck Nathan before he died; as he told police, the death was "an accident."

/////

1    Petitioner also argues that the California Supreme Court's <u>Lasko</u> decision changes
2 the elements of manslaughter in a way that shows his actual innocence of murder. Opp'n at 14.
3 In <u>People v. Lasko</u>, 23 Cal.4th 101, 109-11 (2000), the California Supreme Court made clear that
4 intent to kill is not an element of voluntary manslaughter and invalidated the standard jury
5 instructions, given in this case, which included intent to kill as an element. The court did not
6 abrogate the requirement that the "heat of passion must be such a passion as would naturally be
7 aroused in the mind of an ordinarily reasonable person under the given facts and circumstances."
8 <u>People v. Steele</u>, 27 Cal.4th 1230, 1252 (2002); <u>cf</u>. <u>Lasko</u>, 23 Cal. 4th at 111-12. Petitioner has
9 not suggested what "facts and circumstances" in this case would have brought an ordinarily
10 reasonable person to an assaultive rage against a two-year-old child. He has not sustained his
11 burden of demonstrating his actual innocence of murder based on the clarification of the law.
12    Accordingly, IT IS HEREBY RECOMMENDED that respondent's motion to
13 dismiss be granted.
14    These findings and recommendations are submitted to the United States District
15 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty
16 days after being served with these findings and recommendations, any party may file written
17 objections with the court and serve a copy on all parties. Such a document should be captioned
18 "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
19 shall be served and filed within ten days after service of the objections. The parties are advised
20 that failure to file objections within the specified time may waive the right to appeal the District
21 Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
22 DATED: August 21, 2007.

_____
U.S. MAGISTRATE JUDGE

2

tayl0702.157